You may be seated. May I proceed, Your Honor? Let me call the case. I'm flipping the page over. Let me call the case. I'm glad you're ready to go, though. We'll hear oral argument in our next case, Atiyeh v. Borough of Gettysburg, case number 24-1761. And yes, you may proceed. Let us know how much time you'd like for rebuttal. Thank you, Your Honor. May it please the Court, Gerald Art for appellants, Linda Atiyeh and her business entities. Also with me at counsel table is my colleague, Jocelyn Mendez. We'd like to reserve three minutes for rebuttal, if we may. Sure, that's fine. Thank you. This is a case in which Linda Atiyeh is a very successful entrepreneur in the Borough of Gettysburg. She's invested over the years millions of dollars in real estate, restaurant, and retail businesses within the Borough. Unfortunately, Ms. Atiyeh has also made, I would say, the enmity of the Borough, in particular, the manager of the Borough, longtime manager of the Borough, Charles Gable. And in particular, the enmity arose from Ms. Atiyeh's prevailing in a dispute over the interpretation and application of a signage ordinance in the Borough. Again, when she and one of her businesses was cited and fined repeatedly, and even she was threatened with jail for violating this, Ms. Atiyeh successfully took on the Borough in a legal challenge to the interpretation and application of that ordinance. It ended up with a complete victory for her. It was expensive for the Borough. It was embarrassing for the Borough manager, in particular, who was subject to criticism from members of the public and the local press about it. In fact, that manager demonstrates, or at least there's record evidence that demonstrates that that manager vowed to get back at Ms. Atiyeh. Isn't that really the link that you have to thread in this case? Because the action that you challenge in this case is retaliatory. It wasn't taken by him. It was taken by the Borough Council. And so I get it if he had in his prerogative the ability to just begin to change the ordinances around on his own, but he didn't. It was taken by a Borough Council, and there was turnover of several of the members of the Borough Council between the events in play. So it strikes me that just because there might be a retaliatory animus by one member of the Borough, and I think at least at summary judgment, it seems that that's material dispute. You've got to show that I think the actor in play, the one that actually implemented the policy that you claim is retaliatory, acted with that animus. So how do you cross that bridge? What we do, Your Honor, is that we say that under the test we agree that Mr. Gable in and of himself, he was not a Borough Council member. And if we even agree, just for purposes of your question, that Mr. Gable had the animus but no individual member of Borough Council expressed that same type of animus toward Ms. Itiyeh. But what we have here is our argument is that the Borough essentially acquiesced in Mr. Gable's animus toward it, that they were aware of it, that it was a substantial or motivating factor in proposing the amended ordinance. Mr. Gable was the one, it was his brainchild. It was not the brainchild of the Council itself. And because they were aware of the animus and did nothing to counter that. It was silence on the part, crickets, shall we say, on the part of the Borough Council, that they, at least for purposes of this analysis and for summary judgment purposes, that the Borough Council acquiesced in the animus and essentially made it their own. I mean, the trick with that, the problem with that is there is, it strikes me that from reading the record, there is legitimate non-discriminatory reasons for what the Borough Council did. And so you want the inference that they acquiesced to what I think is a disputed fact, his animus, or at least it's not before us whether we should resolve that fact. But they had other reasons for doing it. There was a lot of people in the borough businesses and otherwise that didn't like kind of the bagging of parking spots for something other than hotels and bed and breakfast. And so it seems that there was a borough issue that needed resolved. It was prompted by your client. And part of the resolution was through the building, the borough manager's office. But does that delegitimize the council's actions? Are you asking me if it delegitimizes their actions? It makes it a violation of the First Amendment, you know, First Amendment retaliation. You know, when they were saying, gee, a lot of people don't like the bagging of this, but because our borough manager doesn't like this woman, it looks like we can do nothing to resolve the bagging problem because, gosh, you know, people could say we've been tainted by his strong feelings. I guess we're just going to have to let her continue bagging, even though more and more people in the borough are starting to complain. What I say, Your Honor, is that the bagging problem was a Linda Atiyah problem, specific problem. I mean, this was not a widespread. It was her. It was her. It was her. It is her. So the fact that, you know, that some others did not like, did not like people in the borough, I agree. Not everybody agreed that there should be bagging for anyone or for Linda Atiyah. But what brought this all to the fore was, you know, the desire to, you know, the desire to prevent Linda Atiyah from being able to continue to bag here. It wasn't to prevent, you know, Joe Schmoe's garage from bagging. I mean, you know, I think factually that I read the record the same way you do, but at one level, I think your client spotted a really, a loophole maybe in the bagging provision. She took advantage of it. It's a really good smart business move. If downtown is going to let you pay $100 a month to get a parking space, as many as you want for your business, do it. That might be a really good business move. She did it and then they realized, yeah, gosh, that's not the policy we want here. And so I guess what my thought is, yes, it's fixated on her kind of, I think, I view it as kind of a shrewd business move to recognize that in the ordinance and do it. But that doesn't necessarily mean that the response was animus. It just means we have someone exploiting a loophole and we'd like to close the loophole. The city manager doesn't like her, the borough manager doesn't like her, but can't we close the loophole without violating the First Amendment? But I think it ties back to her prevailing in the sign ordinance, because as the record would demonstrate, what she did is to the extent that she took a broad interpretation of the sign ordinance that the borough disagreed with that interpretation, but she prevailed on that interpretation. And specifically when they talk about the need to amend the parking ordinance, it was because she took a broad interpretation back in the sign ordinance. She litigated that issue. She won. And it cost the borough money. It was embarrassing. So I think it's back to her prevailing in that dispute. So let's just think about this in terms of what can the borough do then? So you're in the borough council's position now, and everything you said is true. She won. It cost the borough money. Embarrassed people. Very creative arguments in play here. Art is in the sign. Street's not an alley. Stuff like this. Very well done from just a litigation against municipality standpoint. But now the borough wants to say, look, we have to solve this bagging problem. Too many people come up. If you're council to the borough, do you sit there and say, too late, that's water on the bridge? You can do nothing about it. Because anything that you want to do, based on your past history with her, would be a First Amendment violation. And so I guess the borough council, there was turnover on it, would just sit there and say, well, we've got no option. We have to let her continue the bagging because anything that we would do would be a First Amendment violation. How do they continue to legislate and govern for the good of the borough without violating the First Amendment, in your view? Well, Your Honor, I'm not saying that the borough could never amend its parking ordinance. Of course it could, but, you know, you have to look at the reason for the amendment of it and the direction of the amendment. If you look at this amendment or these amendments, it actually is a pretty narrow and almost laser focused on saying, we don't want an ATIA problem again here. We're going to have exceptions for, you know, continue on exceptions for hotels and bed and breakfasts and funerals. And there are a whole host of exceptions. Can we narrow down on the reason? So I heard you in the beginning of your argument say that no individual voting member of the council showed animus. And Mr. Gable showed animus, and the voting members of the council were aware of it and did nothing. But the law says that the voting members of the council have to be aware of it, and it has to be a reason for their vote to amend the parking ordinance. So what is your proof that it was a contributing factor to their vote? Yes, Judge Freeman. I mean, I think the law says it has to be a motivating or substantial factor in doing it. Our proof lies in the, you know, the emails of Charles Gable that were copied to the borough members, where it comes out that, you know, why are they wanting to do this? It's because of Linda Etienne, because of her prevailing in the earlier dispute. It is in the working minutes of the council sessions, council session working minutes. Wait, let's just stop with the emails of Charles Gable. So you're saying because Gable wrote emails saying that tend to show he wanted to get back at ATIA, then the voting members, we're supposed to sort of impute that to the voting members of the council? Yes, because they were all copied on these emails. A recipient of a viewpoint adopts the viewpoint? I'm saying in this instance, the supervisors of Mr. Gable understood what he was doing. They're copied on it, but in fact is, I think, one of them. But by mere receipt, they've adopted that viewpoint? I think by their silence, it can be read, and it could be found by the trier of fact. It could be read that they adopted it. Where we think that the district court, one of the reasons the district court erred here, is that the district court made these determinations of it as opposed to saying this should go to a trier of fact. Is that silence acquiescence? I'm not going to stand before this court and say to you, we win, slam dunk, hands down. You can't find it different. But I believe that a trier of fact could take that silence as the acquiescence and that the district court improperly took that out of the hands of the trier of fact and made that determination itself. And I'm sorry I interrupted you when Judge Freeman was asking you questions. You had started to give me a list of some of the evidence of substantial motivating factors. So the first one was emails of Mr. Gable. The emails from Mr. Gable, the deposition of Mr. Gable, who was deposed as the rule 30b-6 designee of the borough, where he says it was a factor, you know, the prior litigation was a factor in doing this. I know that we have a dispute, my friend disputes whether there is, but, I mean, Mr. Gable's deposition at least, again, creates that issue of fact that a trier of fact ought to be doing it. I think that the deposition of Susan Noggle, if I'm pronouncing her name correctly, the former borough president as well, suggests that. What I'm saying essentially to this panel is that for summary judgment purposes, there were sufficient factual disputes here that it could not be decided based on summary judgment and that it should go to the trier of fact. And as a result, we're asking this court, respectfully, to reverse and remand to have that trial and to have a trier of fact determined. All right. Thank you very much. We'll hear from you on rebuttal. Good morning. May it please the court, Rolf Kroll on behalf of the borough of Gettysburg. Our position is, I hope, clear by our papers, that we believe that, one, there is no proof of retaliatory animus on any single member of the multi-member decision-making body responsible for making the decision to amend its parking ordinance. Two, that the amendment to that parking ordinance was to further a legitimate governmental process Three, that the underlying district court, in assessing that very question, found, as a matter of fact and as a matter of law, that, in fact, it was a legitimate government purpose and the distinction between hotels and other businesses was also legitimate and a legitimate exercise. So the district court stopped at the prima facie case, right? Yes. But, you know, Mr. Gable just gave us, I mean, I'm sorry, Mr. Arth just gave us some of the evidence that perhaps could be enough to satisfy, to get her past the prima facie case, get Atiyah and the other plaintiffs past the prima facie case. Do you agree with that? If Mr. Gable was the decision-maker, I might be bound to agree with that. I mean, what I don't want to do as a litigator is I don't want to admit, because I frankly don't agree. Okay, well, let me ask you something else, though. So I understand you don't have to admit that.  I'm going to, so, but, and there's no smoking gun. There's no statement from a voting council member saying I had an improper bias and an improper reason for this, right? But what I think the plaintiffs are trying to do here is say, well, they're not going to admit that. But Mr. Gable has spoken, particularly in his 30B6 deposition, has spoken for the council and said that that was a factor. Okay, and it's that last part of the court's question, Judge Freeman, that I would focus on. Because what is true and what the email does say, and we're talking about an email from the borough manager, what it does say is that the manner in which the signage dispute was handled raised questions in light of the fact that we had a use of the parking ordinance in a way that was not perceived and intended. And so, therefore, now that is, to me, that is a conflation between retaliatory animus on the one hand for the act of exercising free speech and challenging a signage dispute on the one hand and fixing a problem created by conduct of that same person. And that's an important distinction. So did Mr. Gable say that, say that that was a fact, that the fact that the way that was litigated was a factor in being careful about how we were going to approach the parking ordinance? Yes. Is there any evidence? So, first of all, I think that's a distinction with a difference. But even if it isn't, I would still say that there isn't a shred of evidence, better than that, but there isn't a shred of evidence of that acquiescence or that linkage between the actual decision-making body and the comments of the borough manager. You know, you sure that's not an overstatement? I mean, there's text messages. I think, is it Naugle? I don't know the record as well. But isn't she and Gable texting each other and kind of being in sympathy with each other? Am I thinking of the right name? She and Gable? No. No. The text messages we're talking about are with other constituents of the borough. And I think what's key here, Judge Phillips, Phibbs, excuse me. I messed up the record. You messed up my name. Well, we're recorded, so I'm in trouble. But what's key on that question is that there is no linkage between the actual decision-making members. And the reason that I thought this case would be interesting to this Court, I hope it is, is that is the causal analysis with multi-member decision-makers. I think that's an interesting and evolving. And let me pick up. That is interesting to me, at least in this sense. If you've got a body that has, let's say, seven members, and you have animus of two of the members, but another four there's no evidence of animus of, and that four can form its own separate and apart majority, is that good enough to kind of beat a retaliation charge? Two of the members, let's say, are just hot with animus, right? But four of them, we've got nothing. They say, no, not at all. I'm doing this for completely different reasons. So on multi-member bodies, do we have to get to, if it's a majority rule sort of scenario, do you need to get a majority with animus, or does it matter that you can begin to show some infestation of animus among the body itself? Well, that's the question I was hoping we would discuss today. And, frankly, it's a question that's open for the Court. It is not resolved. But certainly the cases that we've cited suggest that, one, there has to be a causal link between the retaliatory animus and the alleged abridgment of, in this case, of a First Amendment right. So what the august members of the Middle District Courts have said, with no fewer than Judge Kain and Judge Conner and now Judge Michalczyk, have all found that they seem, at least my read of those cases, say they all go with the majority vote. Although you can read Judge Conner's opinion to say, look, we don't need to go there. And he cites a number of cases, including the First, the Second, the Fifth, and the Ninth Circuits. All seem to say some formulation of there has to be an established causal animus. And so I think the cleanest, obviously, in a multi-member setting, is a majority. But at a bare minimum, there has to be some evidence of this causal link. Now, my able colleague suggests that we have acquiesced, suggests that we have been silent. Well, that's just not, in my humble estimation, an accurate recitation of the record. Because it's not that we were silent. In fact, there was very thorough and excellent discovery taken in this case by way of getting all of the text messages, all of the computer messages from every member of counsel. And we executed affidavits. Each and every one of them did. And then Ms. Naugle testified. And although my able colleague suggests that Ms. Naugle's testimony actually supports his position, I asked the court to take a look at 166 and 167, where she said the question before them was, does turning public parking spaces into private spaces work for the community? So I would humbly and respectfully suggest that the record does not support that. I'm sorry to interrupt you, but I want to get back to the kind of the novel questions that says multi-member bodies. Like, so we're talking about, hey, does it take a, you know, if the body takes an action, does the animus have to cause that action? So maybe three members of a similar body have no animus, but the fourth member does. Maybe that's good enough just because that fourth member was the tie-breaking vote. You know, you could imagine those scenarios. But let me ask you this. I mean, most multi-member bodies don't serve for life. This one does. But most don't. And so that means there's going to be turnover. And so what do we make of the fact that I think the turnover is three members? It's a little weird to say, wait, you know, they're retaliating for something that happened when they weren't even on the job. Like, what do we do with the turnover of multi-member bodies? Is there some law that exists on that that basically says, hey, there should be a presumption that if you weren't on the job when the first action happened, you aren't retaliating for it? What do you think? Any law on that? Any thoughts on that? I've got thoughts. I don't have law. Okay. My thought is that it's evidence. That's an evidentiary issue more than a legal issue. It seems to me that the fact that there was turnover weakens their argument that there was retaliatory animus. And one of the concepts in evidence is presumptions. Do you think there should be a presumption that if there's turnover, then it's presumed that they would not be acting with animus? Do you think an evidentiary presumption is useful, or do you think we should just let this play out, prove it as it comes? At the risk of injuring my own argument, I would say that if our roles were reversed and I were in your shoes, I would want to stay away from presumptions of that nature because there could be honest-to-goodness proof. I know Mr. Arth is a very good lawyer, and it wouldn't surprise me if he stands up in a couple of minutes and says to you, well, wait a minute, just because they weren't members of borough council any longer doesn't mean they weren't in the town, doesn't mean that they couldn't have known about it. So, no, I mean, I don't think that that's necessary, and I don't know that I would do it if I were in your shoes. What I do think, though, is that there should be proof. I mean, we're in the proof and evidence business, and in the absence of proof, and I would suggest that the cases that I'm relying on, the Roy and even Lavadour, which got things started in this regard, that was an employee context where the chairman of the board, it was a three-person board, so a lot closer than this one, and said some very unkind things as the employee was on the way out the door, but that still wasn't enough. Now, that opinion didn't go into great detail, and I'm not suggesting that it did, but that's what a number of the other cases, the Watsons and the Roys and the others that we rely on pick up on that notion, and really isn't what we're doing here, isn't what we're asking this court to do, is simply apply causation principles to a multi-member decision-making panel. And I think, so therefore, presumptions, fine. In this case, presumptions serve my client's interest. I'm just not certain that I would put them in in this case, and we certainly don't need them to win, but I would oppose as strongly as – yes, Judge. Yes, I do. So we have a case from 2020, a presidential opinion called Stepin v. Dedona. And in that case, to really break it down, the final decision-maker was the mayor. It was not a multi-person body, but there was a final decision-maker, and at the summary judgment stage there was no evidence that the mayor had improper bias, but there was someone who – a subordinate to the mayor who did have improper bias, and the input from that subordinate was sent to the mayor. That was enough to survive summary judgment. That seems similar to where we are now with Mr. Gable, who provided input to the decision-making body. And at the summary judgment stage, with all inferences going in favor of the plaintiffs here, why would that not be enough? That's a great question, and my answer to it would be principally evidentiary. Again, that's why I'm not crazy about presumptions. I would say that in a case where you've got seven and the only one that's been deposed, it demonstrates no retaliatory animus whatsoever, and you don't even have anything else from the other six except what their text messages say, which is nothing retaliatory. Then I would say that, first of all, the Suppen case, to the extent that it stands for that proposition, that one other person that's not the decision-maker can be enough to overcome summary judgment, is at odds with the other cases that I've cited. I would also say that, evidentially speaking, it's not on all fours. So about the 30 v. 6 deposition. Yes. I think Mr. Gable was informed at the beginning of that deposition that, you know, there would be some questions for him as a fact witness, but the bulk of the questions would be, and those would be saved for the end. The bulk of the questions would be in his capacity as representative of the borough. And in that capacity, he did give information about how the parking dispute came up, and he used the word we to describe some of the thought processes among the decision-makers. And given that, would you agree that that is evidence that we could, at the summary judgment stage, impute to the voting members of counsel? I would not. Not only because of the law that talks about who actually makes these decisions and the fact that they have to be made by a majority vote, but I would also say, again, I would ask the court, and I'm sure it will, look carefully at the record and what he actually said. And, again, it's that what I'm concerned about, and a place where I differ with my able colleague, is what I believe is a conflation between acknowledging that there was activity that the borough was concerned about with respect to Ms. Atiyah in the context of this parking and the notion that it was because of this incident. And my read of Mr. Gable's testimony is, yes, there was an acknowledgment that that happened, but that's not the same as acknowledging that that's why we did what we did, and that's the key. And I have six seconds left. If there's no further questions, we thank you for your argument. Thank you very much. Your Honors, I may be the unusual lawyer who gets up and says I don't need as much time, perhaps, as I reserved, other than to answer further questions from the panel. I'd like to just pick up on two points. One, Judge Freeman's position about the Supan case, if I'm pronouncing it correctly, that I agree that, in fact, you can impute from a lower-level employee, that animus can be imputed up, and I would agree that we think that's exactly what happened here. And second, on Mr. Gable's role as the Rule 30b-6 designee of the borough, there was a laundry list of topics, you can see it, it's in the record, for which he was designated by the borough. They could have designated somebody else or many other people to testify to. So, you know, they can't get away from Mr. Gable's testimony and having it bind them. Now, I agree that my able colleague and I may disagree as to what all he said, what was the import of what he said, but, again, that goes to the heart of what factual disagreements are for purposes of summary judgment, and that those are things that need to be decided by a fact finder and not by a court to prevent things from going to the fact finder. And so, thus, to the extent that there is disagreement over the meaning of the testimony of Mr. Gable on behalf of the borough, again, that goes to the trier of fact and should not have been decided on summary judgment. So we don't have depositions from six of seven of the voting council members, but we do have affidavits from them in which they unequivocally state that this impermissible purpose played no factor in their role. So what are we to do with that? I think that goes, again, Your Honor, that goes to the trier of fact. I agree. I mean, the cookie-cutter affidavits that they gave all say exactly the same thing. It played no role whatsoever in the decision to amend the parking rights. The problem is they're faced with conflicting evidence, including the evidence given by Mr. Gable as the designee for the borough, and, thus, it has to go to a finder of fact. You can't just take those affidavits and say it washes away what their designee testified to, among other pieces of evidence, but that being particular. What do you think, Your Honor? I mean, there's a rule, and I don't know if it's a good rule or not, but it's been with us for a long time that we don't make credibility assessments at the summary judgment stage. It seems like it's a great rule if you like summary judgment because we take the affidavits, we say those are true, we aren't making credibility assessments. It's summary judgment. I'm not sure that's the best rule, but it's deep in the fabric of American law, and aren't you basically asking us to make credibility assessments that what they said in those affidavits isn't true and that they said something other than the truth? Because unless we make a credibility assessment, we accept those as true, and that begins to really hurt your case. Your Honor, I think that respectfully, the standard is generally, you accept as true the evidence of the non-movement part here, and you draw all inferences in the non-movement's favor. You don't weigh credibility there. And even if you could, or even if you're saying you can't weigh any credibility here whatsoever, you have a conflict between the affidavits that were given by the borough council members and, among other things, the testimony of the designee for the borough. So you cannot resolve those conflicts on summary judgment, and again the only people who ought to be able to resolve credibility issues at all is the trier fact, in this instance the jury. Thank you very much. Okay, we'll take a matter under advisement.